PETTIGREW, J.
In this workers' compensation dispute, the employer, Stupp Bros., Inc. d/b/a Stupp Corporation ("Stupp"), appeals from a March 29, 2017 judgment of the Office of Workers' Compensation ("OWC") in favor of the claimant, Alma Alexander. For the reasons that follow, we affirm.
*25 FACTS
At all times pertinent hereto, Mrs. Alexander was employed as an administrative assistant at Stupp. Mrs. Alexander alleged that she was injured in the course and scope of her employment with Stupp on February 12, 2015, when she was moving an office printer. According to the record, Mrs. Alexander was preparing to leave work on the day of the incident, when a co-worker asked if she would order toner for the printer. As she attempted to move the machine to get the serial number from the back of it, Mrs. Alexander was unable to pull it forward because her arms would not "fit behind it to grasp it to pull it forward." Mrs. Alexander continued, describing what transpired next as follows:
I go kneel down like a frog, hold my hand up here and grab the bottom right corner of the printer to move it just enough to peep around and get the serial number without pulling it out. No, it's not heavy. No, of course it's not ... heavy. I just needed to peer around it to get the serial number. And when I'm pulling it from the wall, I feel a tear in my back. And at the same time, my boots are like ... because I'm stooped down, they're like here on my legs, right, here is what I'm saying. And they rub .... They rub the back [of] my leg at the same time I felt a tear in my back, so that's two hard pains together at the same time. So I let go of the printer and fall back against the wall like this, right. And I'm trying to get up. The more I'm trying to get up, the more I'm hurting. So I lean back or fall back, whatever words, they want to use on the floor, because I'm down here already. ...
By that time ... the janitor is coming around, and he said, ["]What you doing down there, you all right, you need something?["]
I said, ["]No, no, I'm fine,["] because I'm embarrassed also. And I maneuver and get myself up[.]
Mrs. Alexander immediately reported the incident to her supervisor, Eric Williams, and asked if she could sign a waiver so she could go to her own doctor; she did not want to pursue a claim with the company. Mr. Williams refused her request and ordered that she be seen by a doctor that day. Another co-worker drove Mrs. Alexander to Prime Medical, where she complained of tightness in her lower back radiating down into her thighs. She was diagnosed with a low back sprain /strain, given over-the-counter medication, and released to return to work. Mr. Williams completed an incident investigation form the same day, documenting the incident and Mrs. Alexander's complaints of pain in her back and the back of her thighs. According to Mrs. Alexander, her biggest concern following this incident was her back, as she had two prior back surgeries. Mrs. Alexander never returned to work following the February 12, 2015 incident.
She returned to Prime Medical the following day with similar complaints. Mrs. Alexander cancelled her previously scheduled trip to visit her terminally ill father in Texas because of her pain and her inability to tolerate the ride. She went to the emergency room at Lane Regional Medical Center on February 16, 2015, with complaints of pain in her back and bilateral posterior legs. Her pain was reported as a 9/10 on the pain scale. An MRI was performed, which revealed a L5-S1 disc extrusion measuring 5 mm with a 3 mm inferior migration impinging on the right S1 nerve root; a L4-L5 broad base disc bulge with a left lateral annular tear measuring 6 mm, approximating the left sided L4 nerve; and a L3-L4 mild annular disc bulge and facet arthropathy with left lateral *26 disc bulge approximating the exiting left sided L3 nerve. The emergency room physician took her off work effective February 16, 2015 through February 19, 2015.
Thereafter, Mrs. Alexander made the first available appointment she could with Dr. Eric Oberlander, a neurosurgeon at The NeuroMedical Center Clinic ("NMC"), who became her treating physician. Dr. Oberlander first evaluated Mrs. Alexander on March 3, 2015. She complained of constant pain in her lower back with pain into her legs bilaterally, ranging from a numbness to pins and needles. She also reported neck pain and bilateral shoulder pain, with numbness into her hands bilaterally. According to Mrs. Alexander, she had the back pain immediately following the incident, and her pain had progressed since that time. She did not start experiencing neck symptoms until a few days later. A subsequent MRI of the cervical spine was completed on April 15, 2015, and Mrs. Alexander saw Dr. Oberlander again on June 8, 2015, to review the results. At that time, she complained of bilateral shoulder, arm, and leg pain, as well as mid and low back pain. Dr. Oberlander noted that the MRI revealed a central disc herniation at C3-4, causing severe spinal cord compression. He further noted that she was not overtly myelopathic, however, the severe stenosis at C3-4 could account for the symptoms she was having bilaterally in her shoulders, arms, and legs. Dr. Oberlander indicated that she was a candidate for a C3-5 ACDF (anterior cervical discectomy and fusion), but that she could try physical therapy and injections.[1] He added, although, that conservative therapy would not ultimately fix her severe stenosis.
Dr. Oberlander submitted a request for surgery on June 18, 2015, which was denied on the basis that a second opinion was required and had been scheduled with Dr. Justin Owen for July 1, 2015. The denial also referenced the failure of Mrs. Alexander to initiate any active therapy as advised by the treatment guidelines.
During her visit with Dr. Owen, Mrs. Alexander relayed the events of February 12, 2015, indicating that while she did not notice any severe exacerbation of pain at that time, it was only shortly thereafter that she began developing worsening back, leg, neck, arm, shoulder, and paraspinal muscle pain that had persisted since the incident. Dr. Owen found her neurological exam to be normal. With regard to his review of her MRI studies, Dr. Owen stated that they were "largely chronic imaging findings, nonspecific symptomology, complaints that are most consistent with musculoskeletal pain." He noted further that Mrs. Alexander had a significant component of depression and anxiety and had not exhausted appropriate conservative measures, such as physical therapy or pain management. Dr. Owen opined that any type of surgery at this time would be "wholly premature."
Because of the differing opinions of Dr. Oberlander and Dr. Owen, Stupp requested an independent medical examination (IME). The OWC Medical Services Department appointed Dr. Anthony Ioppolo as the IME.
Mrs. Alexander followed up with Dr. Oberlander on August 31, 2015. Dr. Oberlander's notes from that visit reflect as follows:
She continues with neck and bilateral arm symptoms/radiculopathy /myelopathy consistent with a C3-4 disc herniation. ... I disagree with Dr. Owen's *27 interpretation of the imaging. The radiologist and I both agree that she has severe stenosis at C3-4 deforming and flattening the cervical cord. She is brisk on exam and appears to have developed myelopathy in the interim. She has another opinion with Dr. [Ioppolo] soon and I'm sure that when he sees the amount of cord compression on the axial images he will agree with my surgical plan. ... I don't understand why her surgery continues to be denied. Her exam is starting to reflect the amount of cord compression that she has I just hope that it isn't too late for her. She has tried physical therapy but couldn't tolerate it. I continue to recommend a necessary C3-5 ACDF to [decompress] her cord and prevent further worsening.
At her next visit with Dr. Oberlander on October 15, 2015, he noted that she had deteriorated and was starting to have burning in her legs and heaviness of her extremities. Mrs. Alexander continued with neck pain. Dr. Oberlander's recommendation for surgery remained unchanged.
Dr. Ioppolo issued his report on November 10, 2015, opining that while Mrs. Alexander could be considered a surgical candidate, she should consider further conservative care before deciding on surgical intervention:
I have reviewed the patient's cervical and lumbar MRI scans. I agree with the radiologist's report. In the cervical spine I think that the patient has multilevel spondylosis with posterior longitudinal ligament thickening at multiple levels. She has a disc extrusion centrally at C3 with cephalad migration and some flattening of the spinal cord at that level. She has disc osteophyte complexes at other levels. I would agree with Dr. Owens that her radiographic changes are most likely chronic and preceded the accident. By history however the patient had no evidence of cervical symptoms prior to this accident. I believe that the accident caused these spondylitic changes to become symptomatic. I also believe that the patient could have furthest [sic] conservative care before deciding on surgical intervention. In that regard I do not see where she has ever had epidural steroid injections. If those do not benefit her, then she certainly can be considered a candidate for surgical intervention as proposed by Dr. Oberlander. Alternately, the patient can control her pain with medication. I note that she is only taking Norco 5 mg twice a day. She has no evidence of myelopathy that would mandate surgical intervention.
In the lumbar spine the patient has a disc protrusion at L5 with inferior migration and compression on the right S1 nerve root. At L4 there is also a disc protrusion with an annular tear. The patient of course has had previous lumbar surgery at the L5 level on the right. Once again, the patient appeared to be doing well since her previous surgery in 1999 until the incident with the office machine. In my opinion, more probably than not, this incident caused her to re-herniate a disc at L5 that is now pressing on the right S1 nerve root. I believe she is a candidate for lumbar epidural steroid injections.
Mrs. Alexander returned to Dr. Oberlander on December 7, 2015, at which time she continued with worsening neck and bilateral arm pain. Dr. Oberlander again noted that her condition had "deteriorated," and made the following observations regarding Dr. Ioppolo's opinion:
She saw Dr. [Ioppolo] who agreed that the accident exacerbated her underlying disease and that she is a candidate for an anterior cervical discectomy and fusion.
*28 He discussed the possibility of injections, but she had a terrible experience with lumbar injections in the past suffering a spinal fluid leak, so she is obviously hesitant to consider injections. I discussed the risks and benefits of an anterior cervical discectomy and fusion C3-5.
Mrs. Alexander continued to treat with Dr. Oberlander throughout 2016. On February 15, 2016, he noted that Mrs. Alexander's symptoms had gotten worse, but that she had been advised she needed a neuropsych evaluation before proceeding with surgery. Dr. Oberlander ordered a consult for same,[2] as well as a consult with a pain management doctor.[3]
On February 29, 2016, Dr. Oberlander held a rehab conference with Stupp's medical case manager. According to Dr. Oberlander's notes, she had a "worsened cervical disc herniation at C6-7 with the central canal down to 5.3 mm which is severe." He opined that "[h]er spinal cord diameter is almost 1/3 of what it is supposed to be" and that the "work related injury likely exacerbated the underlying condition of cervical spondylosis." Dr. Oberlander added that "[c]ervical injections are not recommended at this point due to the severe stenosis, which puts her at increased risk for spinal cord damage with injections." Moreover, he believed that physical therapy "may exacerbate" the problem. He concluded "MRI findings trump need for psychological clearance in this case as well due to severity of MRI findings and clinical correlation of deteriorating symptoms."
In his deposition, Dr. Oberlander elaborated further on the seriousness of Mrs. Alexander's cervical condition. He described her disc herniation as a "dagger cleaving the spinal cord." He noted that Mrs. Alexander's spinal cord is heart shaped when it is supposed to be round. Dr. Oberlander continued stating, "[Y]ou've got this disc herniation digging into the cord making it this funny shape of a heart. And you're going to say that that's not going to cause some symptoms? I mean, that's a [ridiculous] notion. This lady is being affected by this."
On March 29, 2016, Dr. Owen issued an addendum to his original opinion rendered in July 2015. After reviewing Mrs. Alexander's February 25, 2016 MRI, Dr. Owen agreed that there had been "slight apparent worsening of findings at the C6/7 level." He did not agree, however, that the findings were the cause of her pain and symptomatology because the pain relayed *29 to him by Mrs. Alexander was "nonspecific." Dr. Owen noted:
If Mrs. Alexander is beginning to deal with objective signs of myelopathy or change in neurological examination, then I would absolutely agree that cervical surgery is necessary. ...
....
If Mrs. Alexander is progressing with objective signs or symptoms of myelopathy, then I agree with pursuing surgical intervention without significant delay. ... If she has tried and failed physical therapy and does not wish to pursue injections, I think surgery could be considered a reasonable option. However, in my practice I try to make sure that all of my patients are very well-informed regarding all available options and the pros and cons regarding any decisions that are made. Unfortunately in medicine, we cannot predict the future, and Mrs. Alexander's future course is not predictable with certainty. It was not predictable that she would develop a worsening disc herniation at the C6/7 level just as it was not predictable that the work-related accident that she experienced would lead to the onset of these symptoms that she has experienced. In my practice, when individuals are neurologically intact, I generally recommend avoiding surgery if possible, and instead try to find satisfactory quality of life through any less invasive measures, if they are able, but surgery is certainly a reasonable option to pursue in the event that conservative measures fail and/or patients cannot tolerate them or are not candidates for other interventions.
Mrs. Alexander's condition was unchanged when she saw Dr. Oberlander in June 2016. She continued with neck and bilateral arm pain. Dr. Oberlander noted Mrs. Alexander's need for an ACDF at C3-7 because of her severe stenosis and degenerative changes from C3-7. She returned to see Dr. Oberlander on October 24, 2016, at which time he noted that while they had been focusing largely on her neck for the past year and a half, her lower back and leg pain had worsened. He noted that her lumbar films were outdated. Dr. Oberlander added:
We have repeatedly tried to schedule her neck surgery and it has been denied.[4 ] Her w/c stated that they will not cover her cervical injury. She will ultimately need her neck fixed with an ACDF C3-7. She has bad stenosis at C3-4 and C6-7 and this may be causing some of her leg complaints. She is considered totally disabled until she gets her neck fixed.
On November 17, 2016, Mrs. Alexander was seen by Dr. Oberlander's physician's assistant who reviewed the findings from her new lumbar MRI, which was dated November 11, 2016. According to the office notes from that visit, Mrs. Alexander's latest MRI revealed an extruded fragment on the right at L5-S1 with inferior migration, making her a candidate for a right L5-S1 discectomy. However, when Dr. Oberlander was asked about this during his deposition, he indicated that surgery on her back would be too dangerous until she has *30 her neck fixed. He stated, "She has a pinched nerve, but we are not putting her to sleep for back surgery when she has severe spinal cord compression. She'll wake up quadriplegic."
Dr. Oberlander testified further in his deposition that regardless of what the psychological studies say, Mrs. Alexander "can't fake [an] MRI" and has "very serious findings." He noted as follows:
That spinal cord compression at C3-4 can cause just about anything in the body from below. So I'm giving this patient the benefit of the doubt, I'm trying to help her.
And she's got a bad back too, but the back is not going to kill her. This-if she were to have another fall while she's waiting for us to figure out causation, there's zero wiggle room, there's zero wiggle room in her neck right now, she's highly susceptible to spinal cord damage just from a ground-level fall. And folks with severe spinal cord compression usually develop bad balance, that's one of the first things to go, so their balance gets off. So she could have a ground-level fall at home, or if she's in a car accident or has some other type of fall, she could end up with a devastating spinal cord injury because there's no wiggle room there.
On March 23, 2016, Dr. Frey administered a pre-surgical evaluation to Mrs. Alexander. According to Dr. Frey, he interviewed Mrs. Alexander and reviewed her medical records. The interview lasted for about an hour, followed by approximately three and a half hours of testing. Dr. Frey diagnosed her with the following: 1) malingering; 2) somatic system disorder (psychologically complicated chronic pain); 3) high risk for poor surgical response based on psychological risk factors; and 4) an unspecified adjustment disorder. With regard to the malingering diagnosis, Dr. Frey noted several findings of exaggerated symptoms, but qualified his diagnosis by adding that this finding should not be interpreted to mean that Mrs. Alexander is devoid of any symptoms or problems. He concluded, however, that "symptoms and behaviors under her voluntary control cannot be considered a reliable basis for clinical decision-making regarding the severity of her pain, her treatment needs, the efficacy of treatment she has received, or the extent to which she is disabled by pain."
Dr. Frey further found that her exaggeration of symptoms made it impossible to accurately assess the nature and severity of her emotional difficulties, let alone their cause or functional impact. He concluded, "it is not possible to assert any causal connection between her psychological complaints and the index injury, any need for psychological treatment, or any disability related to psychological factors."
Mrs. Alexander was later evaluated by her choice of neuropsychologist, Dr. John F. Fidanza, on May 6, 2016. According to Dr. Fidanza's report, she was "anxious and distressed over being accused of malingering by Dr. Frey." He described the assessment done by Dr. Frey as "large in scope ... with tremendous focus on malingering" ... and "largely directed toward complaints of cognitive functions." Dr. Fidanza noted, "[s]ome test findings may suggest that you can overextend the patience of even a cooperative client, especially with long and unpleasant testing of list learning memory, a task unrelated to her neck and back injury." He added that Mrs. Alexander's poor score on one such test administered by Dr. Frey "proves this disengagement."
With regard to his exam of Mrs. Alexander, Dr. Fidanza performed formal objective testing of personality and current emotional functioning as part of a pre-surgical psychological screening. He noted, *31 "[t]he evaluation was conducted based upon this examiner's understanding of the [OWC] Pain Medical Treatment Guidelines. As such, the examination focused on issues related to emotional factors, subjective interpretation of pain, and addiction potential." Dr. Fidanza found no evidence from his interview of Mrs. Alexander or from the test results to suggest that she should be excluded from undergoing the recommended surgical procedure.
Dr. Fidanza testified in his deposition that there were no clinical or statistical indications that Mrs. Alexander was malingering. He further opined that malingering is a strong diagnosis to make, adding:
[T]here are strong implications with making that diagnosis, saying that a person is intentionally deceiving. When you make that diagnosis, you need to consider all factors, not just the testing, but your clinical interview, the level of pain an individual is in, their intellectual functioning. But you also want to look at other physicians' and other professionals' reports, and if consistently everything indicates that that patient has been deceptive with other people, then you have data to support your diagnosis. In my opinion, I did not see any indication from any of the physicians that suggested that this patient was intentionally trying to deceive anyone. So I would not-I did not make that diagnosis.
PROCEDURAL HISTORY
Stupp began paying Mrs. Alexander weekly benefits in the amount of $610.22 from the date of the alleged incident. Stupp filed a petition pursuant to La. R.S. 23:1314(E), however, on May 3, 2016, seeking a declaration of what, if any, compensation was due to Mrs. Alexander. Stupp alleged that 1) Mrs. Alexander had not sustained a compensable injury on February 12, 2015; 2) to the extent Mrs. Alexander did sustain an injury, the injury was to her low back, not her neck; and 3) Mrs. Alexander had forfeited her right to all compensation benefits pursuant to La. R.S. 23:1208 based on fraud and misrepresentations.
Thereafter, the matter proceeded to a trial on the merits on February 20, 2017, following which the OWC hearing officer took the matter under advisement. On February 24, 2017, the OWC hearing officer ruled from the bench in favor of Mrs. Alexander. The OWC hearing officer provided detailed written reasons and, in a judgment dated March 29, 2017, specifically ruled as follows:
IT IS HEREBY ORDERED, ADJUDGED AND DECREED that there be judgment in favor of the employee/defendant, Alma Alexander and against the employer/plaintiff, Stupp Bros., Inc., as follows:
1. The employee/defendant, Alma Alexander, is found to have sustained an accident in the course and scope of her employment for Stupp Bros., Inc. on February 12, 2015.
2. The employee/defendant, Alma Alexander, is found to have aggravated a pre-existing degenerative condition in her neck and her present symptoms, disability, and need for surgery is related to the work accident.
3. The employee/defendant, Alma Alexander, is entitled to the cervical surgery as recommended by Dr. Oberlander.
4. The employer/plaintiff, was not arbitrary and capricious in its refusal to authorize the cervical surgery; therefore, no penalties and attorney fees are awarded to the employee/defendant, Alma Alexander.
5. The employee/defendant, Alma Alexander, aggravated a pre-existing *32 condition in her lumbar spine; specifically, she re-herniated a disc at the site of a previous lumbar surgery as a result of the work accident. The claimant's pre-existing lumbar condition merged with the work accident which has now resulted in her present symptoms, disability, and ongoing need for medical treatment.
6. The employer/plaintiff, Stupp Bros. Inc. was aware of the employee defendant's, Alma Alexander's, previous back condition as reflected in the Post-Hire Second Injury Fund Questionnaire.
7. The employee/defendant, Alma Alexander, is found not to have violated LSA-R.S. 23:1208.
8. Any delay in the authorization of the cervical surgery recommended by Dr. Oberlander would result in irreparable harm due to the fact the claimant is now experiencing myelopathy as a result of compression of her spinal cord.
It is from this judgment that Stupp has appealed, assigning the following specifications of error:
1. The [OWC hearing officer's] ruling that [Mrs.] Alexander did not forfeit benefits pursuant to La. R.S. 23:1208 is legally and manifestly erroneous.
2. The [OWC hearing officer's] ruling that an accident occurred on February 12, 2015 is manifestly erroneous.
3. The [OWC hearing officer's] ruling that [Mrs.] Alexander injured her neck in the incident on February 12, 2015 is manifestly erroneous.
4. The [OWC hearing officer's] ruling that [Mrs.] Alexander needs neck surgery as a result of the work related accident is manifestly erroneous.
Mrs. Alexander answered the appeal, seeking attorney fees for the additional work required by the appeal.
FORFEITURE OF BENEFITS
(Assignment of Error No. 1)
Louisiana Revised Statute 23:1208(A) provides that "[i]t shall be unlawful for any person, for the purpose of obtaining or defeating any benefit or payment under the provisions of this Chapter, either for himself or any other person, to willfully make a false statement or representation." An employee violating La. R.S. 23:1208 shall, upon determination by an OWC hearing officer, forfeit any right to compensation benefits. La. R.S. 23:1208(E). The three requirements for the forfeiture of the right to workers' compensation benefits under Section 1208 are: (1) there is a false statement or representation; (2) it is willfully made; and (3) it is made for the purpose of obtaining or defeating any benefit or payment. Our Lady of the Lake Regional Medical Center v. Mire , 2013-1051, p. 6 (La. App. 1 Cir. 2/18/14), 142 So.3d 52, 56. Because forfeiture of benefits is a harsh remedy, statutory forfeiture must be strictly construed. Id. An employer has the burden of proving each element within the statute, and the lack of any one of the elements is fatal to the employer's avoidance of liability. Id.
The issue of whether an allegedly false statement or misrepresentation by the employee constitutes a forfeiture of workers' compensation benefits pursuant to La. R.S. 23:1208 is one of fact, which may not be disturbed in the absence of manifest error. Id. Under that standard of review, in order to reverse the OWC hearing officer's determination that Mrs. Alexander did not willfully make false statements for the purpose of obtaining workers' compensation benefits in violation of Section 1208, this court must find *33 that a reasonable factual basis for the finding did not exist and that the finding is clearly wrong (manifestly erroneous). Stobart v. State, Department of Transportation and Development , 617 So.2d 880, 882 (La. 1993). On appeal, the issue to be resolved by this court is not whether the OWC hearing officer was right or wrong, but whether the OWC hearing officer's conclusion was a reasonable one. Id.
After considering the testimony and evidence presented by the parties, the OWC hearing officer provided written reasons for judgment, noting as follows with regard to the issue of the alleged fraud by Mrs. Alexander:
Originally, the employer accepted and paid the claim. Ms. Alexander was receiving indemnity benefits on date of trial. The plaintiff began to dispute the claim when Dr. Frey, after performing a psychological evaluation for the purpose of determining if she could handle a surgical procedure, diagnosed her with malingering. The plaintiff then began to question the entire claim. The Court found no fault in this process; however, Dr. Frey's diagnosis of malingering alone does not equate to 1208 fraud.
....
Dr. Frey's facility gave Ms. Alexander a battery of tests, over about three-and-a-half hours, as well as an in-depth interview. He testified that he threw out some tests he felt might go against her and some tests in her favor, but which were of no real significance; they were simple tests any five year old could pass. He based his diagnosis of malingering on three of the remaining tests. The first two were self-reporting questionnaires and a test of memory. On one of the two self-reporting questionnaires, only three percent of those tested provided similar responses, actually having a painful enough condition to be believable. On the other self-reporting questionnaire, she would have to be in a five percentile, extremely high levels. The Court reviewed the documentary evidence of the testing found in Dr. Frey's report and his testimony. Both self-reporting questionnaires dealt with her abilities, pain and her perceived disability. The Court found the five percentile contained the three percentile, such that Ms. Alexander could be truthful in both instances; they don't represent a different percentage of people in pain. There was no question about her physical condition. At that time, April of 2016, her prior physical exam by Dr. Oberlander set her pain at nine of ten, so she was in a great deal of pain. Her testimony she was in a great deal of pain and she just wanted to get through it and leave. The Court found she gave her best effort possible for her condition at the time, but admonished her for not informing Dr. Frey or his staff so the testing could have been rescheduled. The Court found her lack of good effort was not a deliberate misrepresentation of her condition for the purpose of continuing to obtain benefits, 1208 fraud.
Dr. Fidanza performed a psychological evaluation to determine whether or not she would be a good candidate for the surgery. He found no reason why she wouldn't be a good candidate; she was psychologically stable. Dr. Frey did not really address that issue, whether she could have handled the surgery or not. Once he diagnosed malingering, nothing else was noted. The Court found Dr. Fidanza's depositions and his reasoning more forthcoming and persuasive than Dr. Frey. Also, the fact Ms. Alexander had back surgery in the past and got full resolution and returned to work *34 was a very good indication of her motivation to do the same in this instance.
On appeal, Stupp argues the OWC hearing officer was manifestly erroneous in failing to find that Mrs. Alexander forfeited her benefits based on her false statements and representations regarding the incident and Dr. Frey's diagnosis of malingering. Mrs. Alexander counters that the record overwhelmingly supports the OWC hearing officer's finding that she did not willfully make false statements and representations for the purpose of obtaining workers' compensation benefits.
In this case, after hearing from the witnesses and considering the documentary evidence in the record, the OWC hearing officer concluded that "Dr. Frey's diagnosis of malingering alone does not equate to 1208 fraud." Following our exhaustive review of the record and exhibits in this matter, and considering the obvious credibility determinations made herein, we find no manifest error in the OWC hearing officer's ruling. As is clear from Mrs. Alexander's medical records, there is objective evidence that she sustained an injury to both her back and neck on February 12, 2015, that has resulted in continuing pain in Mrs. Alexander's back, neck, legs, and shoulders, along with numbness in her hands. Mrs. Alexander consistently reported these symptoms to her medical providers, never wavering in her description of the pain. In fact, her condition has worsened over the course of her treatment with Dr. Oberlander. Dr. Oberlander is now of the opinion that Mrs. Alexander is in need of a C3-7 ACDF, rather than the original surgery suggested at the C3-5 level. There is simply no evidence in the record to suggest malingering by Mrs. Alexander other than the report by Dr. Frey, which the OWC hearing officer clearly chose to discredit when compared to the other objective evidence in the record of Mrs. Alexander's continuing pain and symptoms. Accordingly, the OWC hearing officer's ruling on the La. R.S. 23:1208 issue is reasonable and supported by the record.
ACCIDENT AND INJURY COVERED BY ACT
(Assignments of Error Nos. 2 and 3)
Stupp argues on appeal that the finding of a work-related accident on February 12, 2015, is manifestly erroneous "considering that the accident was unwitnessed, the manner in which the accident purportedly occurred is not plausible, and [Mrs.] Alexander's inconsistent reporting of the accident." Stupp further asserts that with regard to her neck injury, Mrs. Alexander is not entitled to the presumption of causation espoused in Housley v. Cerise , 579 So.2d 973, 980 (La. 1991) (finding that an employee's disability is presumed to have resulted from an accident if before the accident, the injured person was in good health, but commencing with the accident, symptoms of the disabling condition appeared and continuously manifested themselves), because the condition in her neck was preexisting and the neck complaints did not manifest themselves immediately after the incident.
Citing Bruno v. Harbert Intern. Inc. , 593 So.2d 357, 361 (La. 1992), Mrs. Alexander maintains that her testimony alone is sufficient to discharge her burden of proving that a work-related accident occurred, provided no other evidence discredits her version of the events and her testimony is corroborated by the circumstances following the incident. Mrs. Alexander adds that the OWC hearing officer made a factual finding that she injured her back and neck in a work-related accident on February 12, 2015, and that this specific finding of fact cannot be disturbed absent a finding of manifest error. We agree with Mrs. Alexander.
*35 An employee in a compensation action must establish "personal injury by accident arising out of and in the course of his employment." La. R.S. 23:1031(A). An accident is "an unexpected or unforeseen actual, identifiable, precipitous event happening suddenly or violently, with or without human fault, and directly producing at the time objective findings of an injury which is more than simply a gradual deterioration or progressive degeneration." La. R.S. 23:1021(1). As in other civil actions, the employee in a compensation action has the burden of establishing a work-related accident. Ardoin v. Firestone Polymers, L.L.C. , 2010-0245, p. 5 (La. 1/19/11), 56 So.3d 215, 218. Moreover, the employee must establish her disability and its causal relation with her employment accident by a preponderance of the evidence. Walton v. Normandy Village Homes Ass'n, Inc. , 475 So.2d 320, 324 (La. 1985).
The employee's testimony alone may be sufficient to discharge this burden of proof, provided two elements are satisfied: (1) no other evidence discredits or casts serious doubt upon the employee's version of the incident; and (2) the employee's testimony is corroborated by the circumstances following the alleged incident. Bruno , 593 So.2d at 361 ; Vargas v. Petrin Corp. , 2012-1212, p. 5 (La. App. 1 Cir. 3/22/13), 115 So.3d 483, 487. Corroboration of the employee's testimony may be provided by the testimony of fellow workers, spouses, or friends, or by medical evidence. Ardoin , 2010-0245 at 5, 56 So.3d at 219. The fact finder's determinations as to whether the employee's testimony is credible and whether she has discharged her burden of proof are factual determinations that should not be disturbed on appellate review unless clearly wrong or manifestly erroneous. Ardoin , 2010-0245 at 5-6, 56 So.3d at 219. If the OWC hearing officer's findings are reasonable in the light of the record reviewed in its entirety, the court of appeal may not reverse even though convinced that, had it been sitting as the trier of fact, it would have weighed the evidence differently. Romero v. Western Sizzlin, Inc. , 94-2302, p. 5 (La. App. 1 Cir. 6/23/95), 658 So.2d 11, 13, writ denied, 95-2296 (La. 11/27/95), 663 So.2d 741.
With regard to whether Mrs. Alexander met her burden of proving a work-related accident and subsequent disability, the OWC hearing officer gave the following extensive written reasons for judgment:
The reason the case was not originally questioned was because although the accident, might have been prevented by Ms. Alexander approaching the request to order toner in a different manner, this did not mean the accident did not occur. On February 12, 2015, Ms. Alexander was asked by Mr. Bergeron to order toner for the copier/printer. Her testimony was when she performed this task in the past she needed a serial number located at the back of the copier on the right-back corner. There was documentary evidence the model number and information for ordering supplies was labeled on the front the copier. But Ms. Alexander testified it was her understanding, she needed the actual serial number. There was no adverse testimony regarding the location of the serial number. So the Court found as a matter of fact, Mr. Bergeron requested her to order the toner and the serial number was located on the back of the copier.Ms. Katy Burns testified the only necessary information to order toner was the model number on the front label of the copier. That may have been the case, but Ms. Alexander's understanding was different. Mrs. Burns testified the copier could be easily moved and this was not contradicted by Ms. Alexander.
*36 But she testified in order to read the rear serial plate, she had [to] squat down in a crouched position and maneuver around behind it. When she did, she felt a tear in her back. The tear in her back caused her to lean against the wall to the side and go on down along the wall, sliding down to the floor. She rested there for a minute, and then after she got her composure, she used the wall to help her slide back up.
The Court viewed the pictures of the copier and found it was in a corner with a wall on the side; this supported Ms. Alexander's version of what occurred. There was a good bit of testimony by Mr. Williams, her direct supervisor, Mr. Sherman, Mr. Williams' supervisor, and Ms. Alexander regarding employment issues between Mr. Williams and Ms. Alexander arising prior to the incident. The Court found those issues to have very little weight. They mainly involved misperceptions and miscommunications to be addressed by Mr. Stolle, the Director of Human Resources, when he returned from a business trip. The only real issue recognized by the Court involved punching in/out to work. This issue could, and very probably would, have been directly addressed by Mr. Stolle; failure to clock in and clock [out] equates to no pay for the day. However, the accident occurred before he returned. Ms. Alexander's performance evaluation was good. Mr. Williams and Mr. Sherman both testified she was a good employee and performed her duties well. The Court found no evidence of Ms. Alexander faking an accident in retaliation for personnel issues or for fear of being laid off.
When the accident occurred, she reported it immediately, went to co-employees and reported it to her supervisor, Mr. Williams. An accident form was filled out. A 1007, First Report of Injury, was filled out. An investigation was performed and a form completed by her supervisor. The investigation failed to specify ANY issues as to the occurrence of an accident as reported by Ms. Alexander.
She was sent the same day to the Prime Medical by her employer and was evaluated by a nurse practitioner. She presented with tenderness in her back and pain down into her thighs. She was diagnosed with a low back sprain /strain, given over-the-counter medication and released to return to work. She returned to Prime Medical the following day, she was scheduled to be off, to see the doctor because he wasn't there the day before. The records show no change in her condition; this was a Friday and she was off for the weekend. Ms. Alexander testified she returned to work on Monday and advised her employer of continued pain and went to Lane Memorial's Emergency Room. A lumbar MRI was performed which found a herniation at L5-S1 with impingement and received two IV medications for pain and inflammation.
The next medical records are of treatment with Dr. Oberlander, Orthopedic Surgeon, on March 3rd. She did not return to work during this period of time. At this evaluation she complained of low back pain down both legs and also neck pain and bilateral shoulder pain with numbness down to her hands. She stated the back pain started immediately followed later by neck pain. In her history, she also described a twisting motion to her fall against the wall next to the copier, which the Court found not to be significantly different from her description at trial or in the accident report. Dr. Oberlander ordered a cervical MRI which found severe spinal cord stenosis from C3 to C5 with the cord *37 flattened. Dr. Oberlander, in his deposition, explained this condition corroborated her reports of neck pain, bilateral leg pain and bilateral shoulder pain and numbness. He stated if the cord is impinged that far up, C-7, it could affect arms and legs. She also had a re-herniation of the L5-S1 disc, but her big problem was this cervical condition.
In light of all of the testimony and the medical and the investigation reports, the reports of injury, the Court found an accident occurred on February 12, 2015 in the course and scope of her employment, where she reinjured her lumbar spine and caused her preexisting cervical spondylosis, to become symptomatic. She had no prior cervical complaints, but she did have a preexisting condition. She had two prior back surgeries back in '98 and '99, from which she completely recovered and returned to work with no issues except for occasional back ache and pain from time to time. She had degenerative disc disease in her back as well, but an actual re-herniation at L5-S1 where the original surgery had been performed. That recurrent herniation was also caused by the work accident.
We find that Dr. Oberlander's deposition testimony and the objective MRI findings were consistent with and corroborated Mrs. Alexander's testimony that she was experiencing pain in her back, neck, legs, and shoulders. When asked about why Mrs. Alexander would have initially only complained of low back pain following the accident, Dr. Oberlander noted, "So a central disc herniation at C3-4, which she clearly has with spinal cord compression, may not present initially as a neck and arm issue, it would show up as back and leg pain first." He testified that it was entirely reasonable for Mrs. Alexander's complaints of radicular pain into her legs to gradually present themselves over a few days after the accident. He further opined that Mrs. Alexander suffered an acute disc herniation at C3-4 and has gone downhill since the accident.
Based on our review of the record, we agree with the OWC hearing officer's conclusion that "an accident occurred on February 12, 2015 in the course and scope of her employment, where she reinjured her lumbar spine and caused her preexisting cervical spondylosis, to become symptomatic." The OWC hearing officer clearly found Mrs. Alexander to be a credible witness. This credibility determination is entitled to great weight because the trier of fact "is in a superior position to observe the nuances of demeanor evidence not revealed in a record." In re A.J.F. , 2000-0948, p. 26 (La. 6/30/00), 764 So.2d 47, 62. Although another fact finder may have made a different credibility determination and weighed the evidence differently, the OWC hearing officer was not clearly wrong in rejecting the attack on Mrs. Alexander's credibility. See Vargas , 2012-1212 at 7, 115 So.3d at 488. Accordingly, we find no manifest error in the OWC hearing officer's rulings that 1) Mrs. Alexander sustained a work-related accident on February 12, 2015; 2) Mrs. Alexander aggravated a preexisting degenerative condition in her neck; and 3) Mrs. Alexander aggravated a preexisting condition in her lumbar spine, specifically re-herniating a disc at the site of a previous lumbar surgery, as a result of the work accident.
NEED FOR SURGERY
(Assignment of Error No. 4)
Finally, Stupp posits that neck surgery, as recommended by Dr. Oberlander, is not warranted because both Dr. Owen, the second medical opinion, and Dr. Ioppolo, the IME, disagree with Dr. Oberlander's recommendation. Mrs. Alexander asserts that she meets all the requirements for a cervical *38 fusion pursuant to the medical treatment guidelines.
An IME's medical conclusions should be given significant weight because the IME is an objective party. Scott v. Wal-Mart Stores, Inc. , 2003-0858, p. 7 (La. App. 1 Cir. 2/23/04), 873 So.2d 664, 669 ; see also La. R.S. 23:1123. However, the opinion of the IME is not conclusive, and the OWC hearing officer must evaluate all of the evidence presented in making a decision as to a claimant's medical condition. Mosley v. Pennzoil Quaker State , 37,199, pp. 4-5 (La. App. 2 Cir. 7/23/03), 850 So.2d 1100, 1103, writ denied, 2003-2412 (La. 11/21/03), 860 So.2d 553. As a general rule, while the trier of fact is required to weigh the testimony of all medical witnesses, the testimony of the treating physician should be accorded greater weight than that of a physician who examines a patient only once or twice. Scott , 2003-0858 at 6, 873 So.2d at 669.
The OWC hearing officer gave extensive reasons for judgment wherein she weighed the findings of Dr. Owen and Dr. Ioppolo against Dr. Oberlander, noting as follows:
The Court found a variance should be given regarding the normal Medical Treatment Guidelines and the surgery was approved. That was based on Dr. Oberlander's deposition. The normal course of treatment prior to surgery is physical therapy for 6 to 12 weeks. Should that fail the next procedure would be epidural steroid injections, one to a series of three. Should that fail and diagnostic testing, MRI, correlates with physical finding surgery could be offered. However, in Ms. Alexander's case, her first attempt at physical therapy, as ordered by Dr. Oberlander on June 8th, per Dr. Oberlander's deposition caused too much pain. He testified her condition, the cord stenosis, supported her complaints the physical therapy was too painful. He also testified this condition, because the cord is flattened in the cervical region and the area is so narrow, could cause an adverse result with attempted epidural steroid injections. Also she had a bad result with an epidural steroid injection when she had her prior back surgeries where she developed a spinal leak. She was very afraid of this procedure. Dr. Oberlander also testified an epidural steroid injection would not fix the problem. It might give her some pain relief, but it would not fix the problem. She's gotten pain relief from staying inactive and taking the pain meds he has given her. She can't drive and she can't work.
Dr. Owen was the plaintiff's Second Medical Opinion physician, and Dr. Ioppolo was the State's Independent Medical Examiner. Both recommended more conservative treatment prior to surgery. The Court found they were unaware of some of her issues as delineated before; i.e. failed physical therapy and unnecessary epidural injection procedures. And Dr. Owen issued a supplemental report in March 2016, after she had another MRI, which showed her stenosis had progressed; from C3 to C5, down to C7. She needed a four-level fusion instead of just a two-level fusion. In Dr. Owen's addendum, he stated he would never agree one should have this surgery just because of pain, that's why a surgical decision necessarily depends on all aspects of her history, her diagnostics, and her physical exam. The Court found her treating physician was in the best position to have all of that information. Her history, the fact she got a good result in the past with surgery, the progression of this development in her neck, the diagnostic testing, and her physical exam came together to form the basis for substantiating *39 the need for surgery with her treating physician. Dr. Owen stated it was within the standard of care to closely monitor those at risk for myelopathy and those with some signs of myelopathy over time, especially high-risk patients, which he felt she was. She has been closely monitored by Dr. Oberlander and she developed signs of myelopathy. Dr. Owen also stated that her symptoms could be directly related to the findings on the MRI, that there is no way to know in advance until she has the surgery and one views the outcome. If she tried and failed physical therapy, which she did according to her testimony and Dr. Oberlander, and does not wish to have the ESI, the surgery is a reasonable option.
....
The Court found the case qualified for Second Injury relief as Ms. Alexander had two back surgeries prior to her employment with Stupp and was working with restrictions/disability. She filled out a second-injury form questionnaire as part of her hiring process on October 18, 2012, and Stupp was informed of her prior back issues. The Court found the prior back disability merged with her present cervical condition to form a greater disability.
The OWC hearing officer gave more weight to Dr. Oberlander, Mrs. Alexander's treating physician, and his belief that Mrs. Alexander's condition would require surgical repair. She clearly took into consideration Mrs. Alexander's testimony regarding the pain she has suffered since the accident and her desire to simply feel better. Simply put, the OWC hearing officer weighed the evidence before her and chose between two permissible views of the evidence. When there are two permissible views of the evidence, a fact finder's choice between them can never be manifestly erroneous or clearly wrong. Stobart , 617 So.2d at 883. Considering the foregoing and the record as a whole, we can find no manifest error in the OWC hearing officer's finding that Mrs. Alexander requires the cervical surgery as recommended by Dr. Oberlander.
ANSWER TO APPEAL-ATTORNEY FEES
Mrs. Alexander has answered the appeal, requesting attorney fees for the work performed on appeal. We note, however, that no attorney fees or penalties were awarded below, as the OWC hearing officer found that Stupp was neither arbitrary nor capricious in its refusal to authorize Mrs. Alexander's cervical surgery. Because Mrs. Alexander has cited no valid authority to support an award of attorney fees on appeal, this request is denied.
CONCLUSION
For the above and foregoing reasons, we affirm the judgment below and assess all costs associated with this appeal against Stupp Bros., Inc. d/b/a Stupp Corporation. AFFIRMED.

There is a reference in Dr. Oberlander's notes from this office visit concerning a problem Mrs. Alexander had with a prior epidural steroid injection years ago. According to Dr. Oberlander's note, she "is afraid to try another injection."

A March 9, 2016 office note from Dr. Brooke Cole indicates that Mrs. Alexander was scheduled for a consult with NMC Psychology in error as the workers' compensation company had already scheduled Mrs. Alexander for a complete psychological clearance, including detailed neuropsychological testing, with Dr. Fred Charles Frey, a licensed psychologist.

Mrs. Alexander first sought treatment at NMC's pain management clinic on March 21, 2016, at which time treatment options were discussed. It was noted that there was concern about epidural steroid injections because of the proximity of her disc and the spinal cord. Accordingly, it was suggested that she try Neurontin 100 mg by mouth three times daily and return to the pain management clinic in six weeks. According to Mrs. Alexander's medical records, she was treated on at least two other occasions at NMC's pain management clinic, and, at each visit, her pain was progressively increasing. A May 23, 2016 urine analysis conducted on Mrs. Alexander confirmed that she was not taking the Neurontin as prescribed by the pain management doctors. When asked about this, Dr. Oberlander indicated that Neurontin has a "ton of side effects" and that it is not uncommon for patients to be given a prescription for the medicine, take a couple of doses, and stop taking it because of the side effects.

According to the record, in addition to the first denial that Dr. Oberlander received in June 2015, he received at least three others. Following an April 26, 2016 surgery authorization request, Dr. Oberlander received two denial letters, one dated May 2, 2016, and the other May 3, 2016, indicating that the C3-5 ACDF had not been approved based upon an "injury to the cervical spine... not [being] included on the initial report of injury." Thereafter, on June 22, 2016, Dr. Oberlander submitted an authorization request for Mrs. Alexander's C3-7 ACDF. He received a denial letter on June 28, 2016, with the same reason provided as the basis for denial as that given in the May letters.