STATE OF LOUISIANA

COURT OF APPEAL

FIRST CIRCUIT

NO. 2022 CA 0478

JAMILYN CALHOUN

VERSUS

SANDERSON FARMS, INC.

Judgment Rendered: __**DEC 1 6 2022**__

* * * * *

Appealed from the
Office of Workers' Compensation, District 6
Parish of Tangipahoa, State of Louisiana
No. 20-00876

The Honorable Diane Lundeen,
Workers' Compensation Judge Presiding

* * * * *

| | |
|---|---|
| Jeffrey C. Napolitano<br>Jeffrey I. Mandel<br>Metairie, Louisiana | Attorneys for Appellant,<br>Sanderson Farms, Inc. |
| Gloria A. Angus<br>Opelousas, Louisiana | Attorney for Appellee,<br>Jamilyn Calhoun |

* * * * *

BEFORE: WHIPPLE, C.J., GUIDRY AND WOLFE, JJ.

**WOLFE, J.**

In this workers' compensation case, the employer appeals a judgment rejecting its claim that the employee committed fraud and awarding the employee benefits, penalties, and attorney fees. We affirm.

## FACTS

On January 31, 2018, Jamilyn Calhoun slipped and fell while working at the Sanderson Farms chicken processing plant in Hammond, Louisiana. Ms. Calhoun worked in the deboning department, where chicken was moved along four assembly lines and x-rayed. In the floor underneath the lines were approximately one-foot-wide drains with heavy metal perforated covers to allow cleaning of the processing area. The accident occurred when Ms. Calhoun slipped on a plastic bag while walking to her work area, which caused her foot to slip into what she described as a partially opened floor drain. Ms. Calhoun fell forward, with her left knee striking the concrete floor. After her coworkers assisted her up, she immediately reported the accident to the appropriate personnel and was seen by the Sanderson Farms safety and health nurse.

On the day of the accident, Sanderson Farms authorized Ms. Calhoun to seek emergency medical care for her knee at North Oaks Medical Center. Thereafter, Sanderson Farms' workers' compensation administrator paid benefits to, and on behalf of, Ms. Calhoun related to her knee injury. On June 22, 2018, Ms. Calhoun had arthroscopic knee surgery performed by orthopedic surgeon Dr. Brian Kindl. After her surgery, Ms. Calhoun participated in physical therapy, but continued to experience pain and her condition worsened.

In November 2018, a routine eye exam led to the discovery of a right optic nerve hemorrhage and swelling of the optic nerves in both of Ms. Calhoun's eyes. She underwent an emergency lumbar puncture to relieve the pressure, then sought treatment from an ophthalmologist, a neurologist, and a physical medicine

2

rehabilitation (pain management) specialist. The opthalmologist, Dr. Patrick O'Sullivan, diagnosed Ms. Calhoun with a pseudotumor cerebri, or a buildup of spinal fluid that caused intracranial pressure, which was relieved by the lumbar puncture and subsequently treated with medication. The neurologist, Dr. Patrick Glynn, opined that Ms. Calhoun experienced post-concussion syndrome with symptoms of lumbar and cervical disc injury. Based on the history Ms. Calhoun provided, Dr. Glynn believed the post-concussion syndrome was related to her work accident. The pain management specialist, Dr. John Nyboer, thought Ms. Calhoun needed further orthopedic evaluation for her knee and would benefit from physical therapy for her back.

Sanderson Farms disputed that any of Ms. Calhoun's medical conditions beyond her knee injury were a result of her January 2018 slip and fall; therefore, neither Sanderson Farms nor its workers' compensation administrator authorized treatment for anything other than the knee injury. They further determined that pain management was not medically necessary.

Ms. Calhoun filed a disputed claim for compensation with the Office of Workers' Compensation. She alleged that when she fell at work on January 31, 2018, she not only struck her knee on the concrete floor, but also hit her head. She asserted that she began treatment at North Oaks at Sanderson Farms' direction, claiming Sanderson Farms failed to inform of her right to choose her own physician. She maintained that she began complaining of headaches shortly after the accident and, despite telling Dr. Kindl of symptoms of accident-related injuries besides the injury to her knee, he did not seek approval for treating those injuries. Thus, Ms. Calhoun requested a change of her choice of orthopedist from Dr. Kindl. She requested Dr. Joseph Bozzelle as her choice of physician in the field of pain management. Finally, Ms. Calhoun contended that Sanderson Farms failed to

3

reasonably controvert her claims, entitling her to penalties, attorney fees, and judicial interest from date of demand for its failure to timely pay benefits.

Sanderson Farms denied that Ms. Calhoun was entitled to another choice of physician or a change to her choice of physician and denied that it unreasonably delayed or denied payment of any benefits or acted in an arbitrary or capricious manner. Sanderson Farms asserted a reconventional demand, alleging that Ms. Calhoun committed fraud by making material misrepresentations for the purpose of obtaining workers' compensation benefits in violation of La. R.S. 23:1208. Sanderson Farms alleged that after she was diagnosed with the pseudotumor cerebri, Ms. Calhoun fabricated the story of hitting her head when she fell at work in an attempt to include treatment for additional conditions within her workers' compensation claim. Sanderson Farms claimed that Ms. Calhoun misrepresented the mechanics of her fall; that she hit her head and was rendered unconscious as a result of the fall; that as a result of the fall she suffered injuries to her eyes, head, spine, or any area of her body other than her knee; that she was denied or not informed of her right to a choice of physician and was directed to certain providers; that she was forced to sign blank forms; and that a scheduled functional capacity exam was canceled by Dr. Kindl. Thus, Sanderson Farms contended that Ms. Calhoun forfeited her workers' compensation benefits and should be ordered to pay restitution. In an amended and supplemental petition, Ms. Calhoun claimed that Sanderson Farms violated La. R.S. 23:1208 when it worked up her claim as one for her left knee only, falsified records, and intentionally denied that she suffered head injuries to avoid paying benefits, and intentionally terminated benefits.

After a four-day trial, the Workers' Compensation Judge (WCJ) found that as a result of the January 31, 2018 workplace accident, Ms. Calhoun sustained injuries to her neck, back, shoulder, elbow, thigh, left knee, and head, including post-concussion syndrome, for which she was entitled to medical care; however, the WCJ

4

found that Ms. Calhoun failed to prove that the pseudotumor cerebri was caused, accelerated, or aggravated by the accident or any occupational disease. The WCJ ordered Sanderson Farms to pay outstanding medical bills for necessary care from Dr. Glynn, Dr. Nyboer, and Dr. Bozzelle, and to pay $11,000.00 in penalties and attorney fees for failing to timely authorize or pay for necessary medical care for the accident. The WCJ further determined that Ms. Calhoun was entitled to temporary total disability benefits in the amount of $41,589.07, subject to a credit for indemnity benefits already paid. Additionally, the WCJ authorized Ms. Calhoun to change her choice of physician from Dr. Kindl to Dr. Bozzelle. The WCJ determined that neither Ms. Calhoun nor Sanderson Farms committed fraud. The WCJ's judgment was signed November 9, 2021.

Sanderson Farms now appeals, contending the WCJ erred in finding that Ms. Calhoun experienced a concussion and suffers from post-concussion syndrome, that Ms. Calhoun did not commit fraud, in allowing Ms. Calhoun to change her choice of physician to Dr. Bozzelle, and in awarding Ms. Calhoun penalties and attorney fees for its failure to properly authorize medical treatment.

**INJURY/FRAUD**

Sanderson Farms contends that the WCJ's ruling that Ms. Calhoun sustained a concussion and suffers from post-concussion syndrome is unsupported by the totality of the evidence in this case. Rather, Sanderson Farms contends the record establishes that Ms. Calhoun lied about hitting her head when she fell, being rendered unconscious, and experiencing headaches. Sanderson Farms points out that its records do not reflect any report of a head injury or headache on the day of the accident. Similarly, Sanderson Farms points out there is no mention of a head injury or headaches in the statement Ms. Calhoun gave to the adjuster who handled the workers' compensation claim. Sanderson Farms maintains that there is no objective evidence that Ms. Calhoun hit her head when she fell at work and that she only began

5

claiming that she did ten months post-accident, after she was diagnosed with the pseudotumor cerebri. Sanderson Farms contends that Ms. Calhoun willfully misrepresented that she hit her head and suffered headaches as a result of her workplace accident. Consequently, Sanderson Farms contends that Ms. Calhoun should forfeit all workers' compensation benefits.

The Workers' Compensation Act provides coverage to an employee for personal injury by accident arising out of and in the course and scope of her employment. La. R.S. 23:1031(A). An employee must prove the chain of causation required by the Workers' Compensation Act by establishing by a preponderance of the evidence that the accident was work-related, that the accident caused the injury, and that the injury caused the disability. **Headley v. Textron Systems**, 2020-1174 (La. App. 1st Cir. 4/26/21), 324 So.3d 1080, 1085. The employee's testimony alone may be sufficient to discharge her burden of proving an accident, provided that no other evidence discredits or casts serious doubt upon the employee's version of the incident; and the employee's testimony is corroborated by the circumstances following the alleged incident. Corroboration of the employee's testimony may be provided by the testimony of co-workers, spouses, friends, or by medical evidence. **Stupp Bros., Inc. v. Alexander**, 2017-1151 (La. App. 1st Cir. 2/20/18), 243 So.3d 22, 35

The determination of whether an employee has carried her burden of proof is factual. Thus, the WCJ's factual findings are reviewed on appeal for manifest error. **Headley**, 324 So.3d at 1085. In applying the manifest error standard, this court must determine whether the WCJ's conclusion was reasonable, not whether the WCJ was right or wrong. **Headley**, 324 So.3d at 1085. If the WCJ's findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse, even if convinced that it would have weighed the evidence differently if it had been sitting as the trier of fact. **Sistler v. Liberty Mutual Ins. Co.**, 558 So.2d 1106, 1112

6

(La. 1990). Where two permissible views of the evidence exist, the WCJ's choice between them cannot be manifestly erroneous or clearly wrong. **Stobart v. State through Dept. of Transp. and Development**, 617 So.2d 880, 883 (La. 1993). Further, the manifest error standard demands great deference to the WCJ's findings that are based on determinations of a witness's credibility. **Shelton v. Smitty's Supply, Inc.**, 2017-1419 (La. App. 1st Cir. 6/12/18), 253 So.3d 157, 163, writs denied, 2018-1195 (La. 11/14/18), 256 So.3d 258 and 2018-1199 (La. 11/14/18), 256 So.3d 291; see also **Rosell v. ESCO**, 549 So.2d 840, 844 (La. 1989). This applies equally to the trier of fact's evaluation of expert testimony. **Guy v. Kelps & Will Prop Shop**, 2018-0956 (La. App. 1st Cir. 2/26/19), 272 So.3d 570, 576.

It is undisputed that Ms. Calhoun did slip and fall at work on January 31, 2018. Ms. Calhoun testified at trial that when she slipped, she fell forward onto the concrete. She described being "flat on [her] face" and unable to get up without assistance. After being helped to her feet, she was embarrassed, disoriented, and dizzy. She testified she did not at first realize that she hit her head, focusing instead on the obvious injury to her leg. Ms. Calhoun stated that she had a headache on the day of the accident, but generally related it to falling and her leg injury.

Immediately following the accident, Ms. Calhoun waited nearly two hours until the plant's safety and health nurse, Robert Cade, arrived. Nurse Cade did not perform a physical exam upon his arrival and instead asked Ms. Calhoun how she felt and what she thought needed to be done. Nurse Cade then sent her home with instructions to elevate her leg and ice her knee, and to call if she thought she needed to see a doctor.

Later that day, Ms. Calhoun notified Nurse Cade that she wanted to seek medical attention and was instructed to return to the plant to complete workers' compensation paperwork. According to Nurse Cade, Sanderson Farm's practice was for the nurse to complete as much of the paperwork as possible to ensure that it was

7

legible. Although Ms. Calhoun testified that she told Nurse Cade she had a headache, on the accident investigation report Nurse Cade identified the type of injury as only "Left Knee Injury." On the employer's report of illness form, he likewise identified Ms. Calhoun's injury as one to her left knee. On another form depicting an anatomical drawing, Nurse Cade circled the left knee and right thigh to identify the location of Ms. Calhoun's injuries. Both Nurse Cade and Ms. Calhoun signed the forms, although Ms. Calhoun claims that when she signed the forms they were blank. Nurse Cade testified that Ms. Calhoun did not complain to him about her head and that he remembered Ms. Calhoun suffering a knee injury.

In its written reasons for judgment, the WCJ described Ms. Calhoun's medical history following the accident as "complex." On the night of the accident, Ms. Calhoun reported to the emergency room for treatment of her knee. She estimated that before her arrival, she had taken 800 milligrams of Ibuprofen to treat her pain. She testified that she informed the emergency room personnel she took the Ibuprofen for a headache and leg pain; however, there is no documentation of a headache in the emergency room records. She admittedly did not inform them that she hit her head, contending that she did not realize it at the time.

Ms. Calhoun's brother, James Calhoun, met her at the emergency room and testified that he noticed a "knot" on her head near her hairline. Ms. Calhoun stated that it was not until several days after the accident that she noticed a small bump and scab on her head, but she did not immediately relate it to the accident. She explained that when the accident occurred, her long, thick hair was dyed red and worn wrapped around her head. Additionally, because it was cold in the plant, she was wearing a hairnet, cap, and scarf on her head, with a hoodie that was also pulled over her head. Ms. Calhoun explained that she initially thought nothing of the bump on her head and attributed her headaches to her leg injury, only later realizing the relationship of the headaches to her head injury.

8

Angeliki Kleamenakis, the adjuster for Sanderson Farms' workers' compensation administrator, testified that she reviewed the documentation submitted by Sanderson Farms before taking Ms. Calhoun's statement on February 5, 2018. During the statement, Ms. Kleamenakis did not ask Ms. Calhoun if she hit her head. As part of the investigation of the workers' compensation claim, Ms. Kleamenakis reviewed the surveillance video of the accident and was satisfied that Ms. Calhoun fell and injured her knee. Ms. Kleamenakis testified that the video showed Ms. Calhoun fall forward to her knees. Ms. Kleamenkais conceded that Ms. Calhoun could have been flat on her stomach and that it could not be determined from the video if Ms. Calhoun struck her head.

In extensive written reasons for judgment, the WCJ thoroughly detailed Ms. Calhoun's medical treatment after the fall, which focused on her knee injury until the discovery of the pseudotumor cerebri. The WCJ summarized:

> The first documented account that Ms. Calhoun was experiencing headaches was in a North Oaks medical note dated February 23, 2018, less than one month after the accident. The review of systems shows "Constitutional, positive for malaise and fatigue". "Neurological, positive for weakness and headaches". On May 25, 2018, physical therapist Laurie Neal noted under her neurological assessment that Ms. Calhoun's "Affect/Mood" was "Anxious, Disorganized". In June 2018, the patient history [from] Southern Surgical Hospital [(where Dr. Kindl performed the knee surgery)] again shows that Ms. Calhoun complained that she was having headaches. On September 26, 2018, Ms. Calhoun reported to Anatomix Physical Therapy that she wasn't "feeling well today and probably [would] go to Lake [A]fter [H]ours". On November 4, 2018, Ms. Calhoun reported to Dr. Kindl "chronic headaches" which she indicated had come about since her accident. In November 2018, Ms. Calhoun reported to Dr. O'Sullivan falling in January 2018 and hitting her head. On February 5, 2020, Dr. Glynn, a neurologist, diagnosed her with post-[concussion] syndrome amongst other things. Dr. Bozzelle agreed with this diagnosis. Ms. Calhoun reported her head injury to Dr. Bozzelle in February 2020.

Dr. Glynn testified that post-concussion syndrome included symptoms of headaches, dizziness, disorientation, short term memory loss, difficulty with concentration, cognitive changes, and personality and mood changes. Dr. Glynn diagnosed Ms. Calhoun with post-concussion syndrome based on the history Ms.

9

Calhoun provided, noting that he accepted her history as truthful. It is obvious that the WCJ also found Ms. Calhoun to be credible, concluding that she sustained a head injury and suffered post-concussion syndrome as a result of the workplace accident. However, Sanderson Farms contends that Ms. Calhoun's credibility is undermined by evidence that she falsely represented hitting her head and suffered from post-concussion syndrome as a result of her fall. As a result, Sanderson Farms argues that this court should not only overturn the WCJ's factual findings regarding the injury but also order that Ms. Calhoun forfeit all workers' compensation benefits for violating La. R.S. 23:1208.

Louisiana Revised Statutes 23:1208(A) prohibits any person from making a false statement or representation for the purpose of obtaining workers' compensation benefits. This includes false statements or misrepresentations made to anyone, including the employer, physicians, or insurers, when made willfully or deliberately for the purpose of obtaining benefits. **Plant Performance Services, LLC v. Harrison**, 2017-1286 (La. App. 1st Cir. 4/6/18), 249 So.3d 1, 6. An employee who is found to have made such prohibited false statements or misrepresentations forfeits any right to workers' compensation benefits. La. R.S. 23:1208(E). Forfeiture of benefits is a harsh remedy; therefore, La. R.S. 23:1208 must be strictly construed. See **Nabors Drilling USA v. Davis**, 2003-0136 (La. 10/21/03), 857 So.2d 407, 414. To prevail on a forfeiture claim, the employer must prove each element required by the statute: (1) that there was a false statement or representation; (2) that it was willfully made; and (3) that it was made for the purpose of obtaining workers' compensation benefits. **Savannah v. Smithy's Supply/Big 4 Trucking**, 2018-1033 (La. App. 1st Cir. 5/31/19), 280 So.3d 615, 620, writ denied, 2019-01286 (La. 10/21/19), 280 So.3d 1168. Like the determination regarding the employee's burden of proving an injury related to the accident, the WCJ's determination as to whether

an employee forfeited workers' compensation benefits is a factual issue subject to the manifest error standard of review. See **Headley**, 324 So.3d at 1089.

Although Sanderson Farms emphasizes that there is no documentation of a head injury or headaches in its own records, that documentation was largely attributable to Nurse Cade. Sanderson Farm's documentation was then used by Ms. Kleamenakis to prepare the questions asked during Ms. Calhoun's recorded statement. However, the WCJ explained in written reasons that she found Nurse Cade's testimony and documentation of the accident to be unreliable, stating:

> Mr. Cade has a serious hearing problem which this court observed posed difficulties for him in hearing the attorneys and the judge in a quiet courtroom during trial. More significantly, at the conclusion of his testimony, Mr. Cade admitted that he had neither heard nor understood many of the questions that either side had presented to him at trial due to his hearing loss despite trying to answer the same. Mr. Cade testified that due to his hearing problems, he was never really sure of what anybody tells him. Mr. Cade also acknowledged that if Ms. Calhoun reported injuries to him, including but not limited to her head, he may not have heard them to record them.

In light of the WCJ's determination that Nurse Cade's factual account and testimony were unreliable, and recognizing that Nurse Cade's factual account influenced the documentation by its adjuster, we find no error in the WCJ's rejection of Sanderson Farms' argument of fraud in this regard.

Sanderson Farms also contends that Ms. Calhoun falsely represented that she was rendered unconscious after she fell, noting she made no such representation until 2020. Further, Sanderson Farms contends Ms. Calhoun's testimony that Dr. Glynn told her she likely suffered unconsciousness was contradicted by Dr. Glynn's testimony that Ms. Calhoun reported to him that she lost consciousness when she struck her head.

Ms. Calhoun admitted that she did not initially report a loss of consciousness to anyone, explaining that she did not realize it at the time. Following discovery of the pseudotumor cerebri, Dr. O'Sullivan referred her to Dr. Glynn for a neurological

11

consult; however, she did not see Dr. Glynn until 2020, when his treatment was authorized in this proceeding. She explained that when she told Dr. Glynn about the fall, he questioned her about how quickly she was able to get up and how many seconds she remained on the floor. She testified that based on her responses and symptoms, he stated it was more than likely that she lost consciousness for a few seconds. Ms. Calhoun stated that it was only in hindsight, considering her symptoms, the medical findings, and with the benefit of Dr. Glynn's observation, that she came to realize she lost consciousness when she fell.

Dr. Glynn testified in his deposition that when he met with Ms. Calhoun, she reported striking her head and a subsequent loss of consciousness for an undetermined amount of time. He later clarified that he always asks patients with a history of a head injury if they lost consciousness and often they do not know if they did, but are unable to recollect a period of time following the injury. He explained, "So ... you take that as a - - as a loss of consciousness or the same significance as a loss of consciousness if somebody has a period of time where they don't really recollect what had happened." He confirmed that since Ms. Calhoun reported being disoriented after the accident and was unsure of what immediately followed, he noted that she reported a loss of consciousness. Considering Dr. Glynn's explanation, which the WCJ specifically referenced in her written reasons, we find that Sanderson Farms failed to prove that Ms. Calhoun made false representations in this regard.

Sanderson Farms next claims Ms. Calhoun misrepresented when she saw Dr. Bozzelle in relation to her consultation with Dr. Glynn. She first testified that she saw Dr. Bozzelle the day after she consulted with Dr. Glynn. She explained that she told Dr. Bozzelle she lost consciousness when she fell because that was what Dr. Glynn told her. When her testimony of seeing Dr. Bozzelle after Dr. Glynn was challenged on cross examination, Ms. Calhoun clarified that she did see Dr. Bozzelle

first and was told to call him after seeing Dr. Glynn. She stated that Dr. Bozzelle's treatment plan was affected by the risk of increasing her cranial pressure. Thus, Ms. Calhoun testified that she called Dr. Bozzelle the day after her appointment with him to relay Dr. Glynn's neurological assessment and reported that she briefly lost consciousness after the fall.

Sanderson Farms additionally argues on appeal that Ms. Calhoun lied about the reason she changed her choice of physician in the specialty of pain management. Dr. O'Sullivan referred Ms. Calhoun to Dr. Nyboer, an expert in the fields of physical medicine, rehabilitation, and pain management, and Ms. Calhoun saw Dr. Nyboer in April 2019. Both Ms. Calhoun and her brother James, who went with her to the appointment, testified that Dr. Nyboer would not treat Ms. Calhoun as a workers' compensation patient. Sanderson Farms contends that testimony was contradicted by Dr. Nyboer's testimony that he had no limitation on the number of workers' compensation patients he treated.

The WCJ's rejection of Sanderson Farms' arguments regarding the date Ms. Calhoun saw Dr. Bozzelle and the reasons for seeking a pain management specialist other than Dr. Nyboer essentially required the WCJ to make a credibility determination. Obviously, the WCJ found that Ms. Calhoun was credible and truthful in her explanations. The WCJ is in a superior position to observe and review the demeanor of the witnesses and evaluate credibility. **Stupp Bros., Inc.,** 243 So.3d at 37. Although another factfinder may have made a different credibility determination and weighed the evidence differently, the WCJ was not clearly wrong in rejecting Sanderson Farms' attack on Ms. Calhoun's credibility and correlative claim that she forfeited all workers' compensation benefits.

For the foregoing reasons, we find that the record reasonably supports the WCJ's factual finding that Ms. Calhoun sustained a head injury as a result of her workplace accident and suffered from post-concussion syndrome, which was related

13

thereto. We further find no merit to Sanderson Farms' arguments that Ms. Calhoun made false statements or representations in violation of La. R.S. 23:1208 and forfeited her right to benefits.

## CHOICE OF PHYSICIAN

On appeal, Sanderson Farms additionally contends the WCJ erred in allowing Ms. Calhoun to change her choice of physician to Dr. Bozzelle. Sanderson Farm denies that Ms. Calhoun should be allowed to treat with a physician in the field of physical medicine or pain management, but argues that if she should be allowed to treat with such a physician, then she should be limited to her selection of Dr. Nyboer in that field.

Pursuant to La. R.S. 23:1121(B), the employee has the right to select one treating physician in any field or specialty. After her initial choice of physician, the employee is required to obtain prior consent from the employer or the workers' compensation carrier for a change of treating physician within that same field or specialty. However, the employee is not required to obtain approval for changing to a treating physician in another field or specialty. La. R.S. 23:1121(B)(1).

The WCJ recognized that Ms. Calhoun selected Dr. Kindl as her choice of physician. Dr. Kindl opined that Ms. Calhoun would benefit from treating with a pain management specialist. Pursuant to La. R.S. 23:1121(B)(1), Ms. Calhoun was entitled to change her choice of physician to one in a different specialty.

Sanderson Farms argues, however, that it did not refer Ms. Calhoun to Dr. Nyboer and that she selected Dr. Nyboer as her choice of physician in the specialty of physical medicine and pain management. Ms. Calhoun counters that she saw Dr. Nyboer only once and he did not treat her as a workers' compensation patient. Thus, Ms. Calhoun disputes that she selected Dr. Nyboer as her choice of specialist in that field. The WCJ accepted Ms. Calhoun's position that although she did consult one time with Dr. Nyboer, he did not treat her as a workers' compensation patient and

14

therefore he was not her choice of physician in his specialty. Considering the unique facts of this case, we are unable to conclude that the WCJ erred in finding that Ms. Calhoun is entitled to change her choice of physician from Dr. Kindl to Dr. Bozzelle.

## PENALTIES AND ATTORNEY FEES

Finally, Sanderson Farms contends the WCJ erred in assessing it with penalties and attorney fees for failing to timely pay workers' compensation benefits. Sanderson Farms maintains that Ms. Calhoun suffered a knee injury, which was treated as compensable and for which it paid benefits. Sanderson Farms contends that since Ms. Calhoun did not assert a head injury until ten months after the accident, it had well-founded reasons for denying related treatment.

Unless an employer reasonably controverts a workers' compensation claim, its failure to pay benefits in accordance with the Workers' Compensation Act shall result in a penalty and reasonable attorney fees. See La. R.S. 23:1201(F); **Headley,** 324 So.3d at 1086. An employer reasonably controverts a claim when it has sufficient factual and/or medical information to counter the employee's factual and/or medical information throughout the time it refused to pay all or part of the benefits allegedly owed. **Headley,** 324 So.3d at 1086 (citing **Brown v. Texas-LA Cartage, Inc.,** 98-1063 (La. 12/1/98), 721 So.2d 885, 890 and **Shelton,** 253 So.3d at 169). Statutory provisions permitting the assessment of penalties and attorney fees for nonpayment of workers' compensation benefits are penal in nature and must be strictly construed. Penalties should not be imposed in doubtful cases, where a bona fide dispute exists as to the claimant's entitlement to benefits, and the mere fact that an employer loses a disputed claim is not determinative. **Alvis v. Peninsula Gaming Partners, LLC,** 2020-0161 (La. App. 1st Cir. 11/12/20), 316 So.3d 54, 60. The crucial inquiry is whether the employer had an articulable and objective reason to deny payment at the time it took action. **Headley,** 324 So.3d at 1086-87. The WCJ's determination that an employer should be cast with penalties and attorney

15

fees is a factual determination subject to the manifest error standard of review. **Authement v. Shappert Engineering**, 2002-1631 (La. 2/25/03), 840 So.2d 1181, 1188-89.

In her written reasons for judgment, the WCJ explained that Ms. Calhoun made written demand for medical care by Dr. O'Sullivan, Dr. Nyboer, and Dr. Glynn. As Sanderson Farms' orthopedist had not yet evaluated Ms. Calhoun, the WCJ found that Sanderson Farms had no evidence to contradict Ms. Calhoun's need for medical care from those doctors or dispute that the requested care was related to her work injury.

Ms. Calhoun saw Sanderson Farms' orthopedist, Dr. Paul VanDeventer, in October 2019. He concluded that Ms. Calhoun's back, shoulder, head, and neck complaints were not caused by her fall; however, he agreed that some back and shoulder complaints were due to changes in her gait resulting from her knee injury. In summarizing Dr. VanDeventer's testimony, the WCJ specifically noted that he was not provided with Ms. Calhoun's complete medical records, including reports from Dr. Glynn and Dr. Nyboer. The WCJ further noted that Dr. VanDeventer did not examine Ms. Calhoun to determine if she suffered a concussion. Thereafter, in November 2020, Sanderson Farms rejected all requests by Dr. Bozzelle for authorization of treatment.

In assessing Sanderson Farms with penalties and attorney fees, the WCJ explained:

> Once Sanderson Farms had information contradicting Dr. VanDeventer's findings, it had an obligation to investigate Ms. Calhoun's requests for medical care before it denied the same. The employer or insurer has a continuing duty to investigate and make every reasonable effort to assemble factual and medical information to ascertain whether a claim is compensable before denying benefits. [**Connor v. Family Dollar Store**, 2009-1537 (La. App. 1st Cir. 3/26/10), 36 So.3d 339, 350, writ denied, 2010-0959 (La. 6/25/10), 38 So.3d 344.] When Ms. Calhoun and subsequently Dr. Bozzelle requested additional medical care, [the] employer and its insurer had a duty to determine whether the care was due before denying benefits. A

16

failure to authorize benefits is a failure to furnish benefits[,] which leaves the employer or insurer subject to penalties and attorney's fees. [**Sevin v. Chevrolet**, 2008-1362 (La. 4/30/09), 24 So.3d 879, 889.] When Ms. Calhoun's attorney sent the September 19, 2019, written demand stating that Ms. Calhoun needed medical care and that the care was related to the accident, the adjuster had a duty to determine whether that care was due. When Dr. Bozzelle sent written requests for care related to the accident, the adjuster denied them within one day because [the] insurer deemed all care other than the knee to be controverted without further investigation. An adjuster who ignores the possibility that an accident caused the medical condition when there is evidence of causation, has failed to fulfill his duty to investigate and to make every reasonable effort to assemble medical information to determine whether the accident caused the injury before denying those benefits. [**Shelton**, 253 So.3d at 171.] ...

Instead of authorizing any initial care, [Sanderson Farms' workers' compensation administrator] sent Ms. Calhoun to its own orthopedist, Dr. VanDenter. Dr. VanDenter did not relate Ms. Calhoun's problems to her accident. However, Dr. VanDeventer had limited information as a direct result of the adjuster only sending him select portions of some medical records. Further, subsequent to Dr. VanDeventer's opinion, defendants had information from Drs. Glynn, Nyboer, and Bozzelle indicating that Ms. Calhoun needed medical care related to the subject accident. While defendants were not unreasonable in denying care related to the pseudotumor cerebri ... defendants had an obligation to investigate Ms. Calhoun's orthopedic and post-[concussion] complaints further to determine their compensability. An insurer or employer which first receives a favorable medical report, but later receives information indicating the possibility of a continuing disability may not blindly rely on the earlier report to avoid attorney fees. [**Connor**, 36 So.3d at 350.] The blanket and ongoing denial of all medical care related to any body part other than the knee was an unreasonable disregard of [the] employer and insurer's duty to investigate the claim before denying the same. This conduct was wholly within their control. Therefore, penalties and attorney's fees are due for failure to authorize and/or pay for medical care timely.

After careful review, we find that the WCJ's determination is a permissible view of the evidence in this case. Where two permissible views of the evidence exist, the fact finder's choice between them cannot be manifestly erroneous. **Stobart**, 617 So.2d at 883. Thus, although we may have reached a different conclusion had we been sitting as the fact finder, we will not disturb the WCJ's decision to assess Sanderson Farms with penalties and attorney fees.

17

## CONCLUSION

For the foregoing reasons, the November 9, 2021 judgment is affirmed. Costs of this appeal are assessed to the appellant, Sanderson Farms.

**AFFIRMED.**